UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WOODARD HEATH, JR.,               )
                                  )
        Plaintiff,                )
                                  )     No. 1:08CV00157 FRB
                                  )
        v.                        )
                                  )
                                  )
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
        Defendant.                )

**MEMORANDUM AND ORDER**

        This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

        On December 22, 2005, plaintiff Woodard Heath, Jr.
("plaintiff") filed applications for Supplemental Security Income
Benefits ("SSI") and Disability Insurance Benefits ("DIB").
(Administrative Transcript ("Tr.") 96-105).  Plaintiff's
applications were initially denied, and he requested a hearing
before an administrative law judge ("ALJ").  (Tr. 62-63; 75).

        On June 8, 2007, a hearing was held before ALJ Robert E.
Ritter.  (Tr. 23-61).  on December 20, 2007, ALJ Ritter issued his
decision denying plaintiff's applications.  (Tr. 6-22).

-1-

Subsequently, plaintiff sought review of the hearing decision with defendant Agency's Appeals Council. (Tr. 5). On August 21, 2008, the Appeals Council denied plaintiff's request for review. (Tr. 1-4). The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. <u>Plaintiff's Testimony</u>

During the administrative hearing, plaintiff was represented by attorney Teresa Schellhammer. At the outset of the hearing, plaintiff's counsel requested amendment of the onset date from December 2005 to November 1, 2005.

Plaintiff testified that he had an Associate's degree in business administration from Three Rivers Community College. (Tr. 28). Plaintiff testified that, from 1988 to November of 2005 he worked for the Department of Mental Health as a residential assistant and aide in a home for mentally ill and handicapped people. (Tr. 28-29). In 1994, plaintiff also worked part-time as a community integration worker in a program designed to help mentally retarded people integrate into the community. (Tr. 29). Plaintiff was assigned to one particular person, one day per week, for six hours. (Tr. 29). Plaintiff also testified that, five or six years ago, he played the drums and performed backup vocalization in a band on a part-time basis. (Tr. 30).

Plaintiff testified that he was unable to work because his balance is very poor and he has fallen on numerous occasions. (Id.) Plaintiff testified that he has also lived with back pain for numerous years, and now has neck and head pain along with his "motion disorder or dizziness." (Id.) Plaintiff described his dizziness as ranging from an "elevator to a roller coaster type." (Tr. 31). Plaintiff testified that he has some sort of dizziness at least 80 percent of the time; that he usually felt dizziness when standing; and that, sometimes while sitting, he had no dizziness. (Tr. 31-32). Plaintiff testified that long rides in vehicles, exiting an elevator, bending over, walking long distances, and any type of motion increased the dizziness, and that he had to use a shopping cart while in the grocery store or in Wal-Mart because there was "something about the high ceilings." (Tr. 32). Plaintiff testified that, when he felt the sensation, he tried to get to a safe seat to avoid falling, and had to wait for the symptoms to subside. (Tr. 33). Plaintiff testified that he has tried medication to no avail, but that he was presently taking Valium[1] three times daily with no improvement in symptoms. (Id.) Plaintiff testified that, because of the dizziness, he had to be very careful in all that he did. (Tr. 33-34).

Plaintiff testified that he also had neck and head pain.

---

[1]Valium, or Diazepam, is used to relieve anxiety, muscle spasms, and seizures, and to control agitation caused by alcohol withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682047.html

(Tr. 34).  Plaintiff described his neck pain as feeling like a knife or corkscrew twisting in the base of his neck, and testified that he felt neck pain of this intensity 50 percent of the time. (Tr. 34-35).  He testified that he also had migraines.  (Tr. 34-35).  Riding for long periods of time, bending over, and walking too far (described as walking for 45 minutes to an hour in Wal-Mart) exacerbated this pain.  (Id.)  Plaintiff testified that he could comfortably cook, and that he could wade for 60 to 90 minutes in his swimming pool.  (Tr. 35-36).  He testified that he could stand for ten to fifteen minutes before needing to grab on to something or lean on a wall.  (Tr. 36).

Plaintiff testified that he also suffers from intermittent head pain, which he described as the type of headache one would get when very hungry.  (Id.)  Plaintiff testified that weather changes and temperature extremes exacerbated his head pain. (Tr. 37).  He testified that he took a lot of medicine, and also used a heating pad.  (Id.)

Plaintiff testified that he had not fallen in "two to three months," and that he had learned to move slowly to avoid falling.  (Tr. 37-38).

Plaintiff testified that he had "memory problems," which he described as problems communicating, and with retaining new telephone numbers.  (Tr. 38).  He explained that he had trouble getting his point across and finding the right word, and with remembering instructions and text he read recently.  (Tr. 38-39).

Plaintiff testified that he saw Dr. Richard Musser on a monthly basis. (Tr. 39). He testified that he had been seeing a different doctor who prescribed antidepressants, but that plaintiff did not feel he was depressed. (Id.) Plaintiff testified that he had been seeing a pain specialist who administered epidural injections, which sometimes helped his pain, but he stopped getting them when insurance stopped covering them. (Tr. 39-40). Plaintiff testified that Prednisone[2] helped some, but not as well as the injections. (Tr. 40).

Plaintiff testified that, eight to ten years ago, he injured his lower back, and that he now had lower back pain that felt like a dagger or a corkscrew. (Id.)

Plaintiff testified that he spends a lot of time with his 90-year-old father. (Id.) He testified that he lives with his wife, who is employed and works twelve-hour shifts, and nine-year-old daughter. (Tr. 41). Plaintiff testified that, if his neck and back were not bad, he did laundry, cleaned the kitchen and bathroom, and cooked meals for his daughter. (Id.) Plaintiff testified that his symptoms sometimes affected his ability to do these activities, and that, "20 to 30 percent" of the time, he did not do these activities due to symptoms. (Id.) When not doing

---

[2]Prednisone is used to treat symptoms associated with low corticosteroid levels, and is also used to treat severe allergic reactions, multiple sclerosis, lupus, and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601102.html

chores, plaintiff watched TV, listened to music, and, if able to drive, spent time with his father, and took him to the grocery store and on other outings. (Tr. 42). Plaintiff testified that he used to go to church, but that now it was difficult to sit in the pew, and that he was not involved in any social activities or clubs. (Id.) Plaintiff testified that he took Prednisone. (Id.)

Plaintiff testified that he stopped working in November of 2005 because his dizziness became severe. (Tr. 43). The ALJ asked plaintiff whether he could stay at a work site for eight hours per day if his job were as simple as coming to the hearing and talking, as he was presently doing, and plaintiff testified that he probably could. (Id.) Plaintiff testified that he could not do a job involving assembly because of cramping in his hands. (Tr. 44).

The ALJ then heard testimony from Boris Alex, M.D., a medical advisor. (Tr. 44). Dr. Alex testified that plaintiff did not have any medically determinable impairments. (Tr. 49-50). Dr. Alex testified that plaintiff did not meet the listings for lumbar or cervical impairments, due to negative MRI examinations and a negative cervical myelogram. (Tr. 49). Dr. Alex testified that plaintiff also failed to meet section A or B of Listing 2.07,[3] noting that Dr. Goebel opined that plaintiff did not have true

---

[3]Listing 2.07 refers to a disturbance of labyrinthe-vestibular function, including Meniere's disease. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 2.07.

vertigo, and needed a cervical collar and muscle relaxants, and further stated that plaintiff was capable of sedentary work with certain restrictions. (Id.)

The ALJ asked Dr. Alex what might be the cause of plaintiff's symptoms if he did not have true vertigo, and Dr. Alex responded that Dr. Goebel thought he had "post traumatic dis-equilibrium," which referred to feelings of unsteadiness after an injury to the brain. (Tr. 50). Dr. Alex explained that a person with true vertigo would have evidence of disequilibrium of the semi-circular canals, with which there would be positive objective findings of nystagmus, and that all of plaintiff's objective tests were negative for evidence of semi-circular canal disorder. (Id.) Dr. Alex testified that there was no reason to doubt that plaintiff experienced dizziness, but that his condition did not meet a listing of requirements. (Id.) Dr. Alex opined that, from a physical standpoint, there was nothing in the record that would preclude plaintiff from lifting up to ten pounds occasionally and smaller amounts more frequently, with a precautionary restriction to non-hazardous work settings. (Tr. 50-51).

The ALJ then asked Dr. Alex whether there were any inconsistencies or contradictions in the record that caused him to doubt any of plaintiff's allegations. (Tr. 51). Dr. Alex replied that, while Dr. Cohen's September 7, 2006 report opined that plaintiff was totally disabled, Dr. Cohen went on to note work restrictions. (Id.) Dr. Alex testified that, if a person was

considered totally disabled, restrictions would be irrelevant, and concluded that Dr. Cohen's report was inconsistent. (Tr. 51-52). Dr. Alex testified that he did not think plaintiff had established, by the weight of the objective evidence, that he had a condition precluding all activities. (Tr. 51).

The ALJ then heard testimony from Jeffrey Francis Magrowski, Ph.D., a vocational expert ("VE"). Dr. Magrowski testified that plaintiff's past work as a psychiatric aide was similar to that of a developmental aide, and was considered "medium" work by the Dictionary of Occupational Titles ("DOT"). (Tr. 55). However, Dr. Magrowski testified that, based upon plaintiff's testimony about how he performed the job, he (Dr. Magrowski) would classify plaintiff's past work as skilled, and heavy or very heavy. (Tr. 55). Dr. Magrowski also noted that plaintiff had worked as a medication aide. (Id.) Dr. Magrowski testified that plaintiff had many skills, including teaching and clerical skills. (Tr. 55-56).

The ALJ asked Dr. Magrowski to keep plaintiff's background in mind, and to assume a hypothetical claimant who was limited to lifting 20 pounds occasionally and 10 pounds frequently; who could sit, stand, and walk for six hours each in an eight-hour workday; who should never climb ladders, ropes or scaffolding, or engage in work requiring him to balance; who had to avoid concentrated exposure to hazardous work settings; and who could not work around open machinery or unprotected heights. (Tr. 56). Dr.

Magrowski testified that such a person could not perform plaintiff's past relevant work, but could transfer his skills to work that he could perform. (Id.) Dr. Magrowski testified that plaintiff could work as a companion or a greeter, which was lower, semi-skilled work, and could also work as a file clerk, which was semi-skilled and light. (Tr. 57).

The ALJ then asked Dr. Magrowski to assume a hypothetical person as limited as the first in a non-exertional sense, but who could still do sedentary work; lift ten pounds occasionally and smaller amounts more frequently; had to perform most of his work in a seated position and could sit with normal breaks throughout an eight-hour day; and could stand and walk for no more than two hours in an eight-hour day. (Tr. 57). Dr. Magrowski testified that such a person could transfer his skills to semi-skilled jobs such as a cashier and some customer service work; and work involving answering the telephone, such as a telephone answering service operator. (Tr. 57-58). Dr. Magrowski also noted that plaintiff's vocational evaluation showed that he had very good reading, math and spelling skills. (Tr. 58).

Plaintiff's attorney asked Dr. Magrowski to include problems with memory and finding the right word in normal conversations; problems recalling and remembering numbers, and problems with understanding, reading, and comprehension, even at a third-grade level. (Tr. 59). Dr. Magrowski testified that those restrictions were severe, and that he would be unable to identify

significant numbers of jobs which such person could perform.  (<u>Id.</u>)
Dr. Magrowski then offered the vocational codes for all of the jobs
he had identified earlier.  (Tr. 59-60).

B.    <u>Medical Records</u>[4]

The record indicates that plaintiff was treated by K.
Charles Cheung, M.D., from April 10, 2000 through August 28, 2000
for complaints of low back pain.  (Tr. 199-203).  Dr. Cheung noted
that an MRI scan revealed a small disc bulge at L4-5, and
administered trigger point injections.  (Tr. 201).

The record indicates that plaintiff saw Wai Chiu, M.D.,
from July 10, 2000 through August 21, 2000.  (Tr. 184-96).  Dr.
Chiu's notes indicate that plaintiff complained of low back pain,
and was treated with trigger point injections, and referred for
physical therapy.  (<u>Id.</u>)  The record also indicates that plaintiff
had a course of physical therapy at Mid America Rehab from July 24,
2000 through August 21, 2000.  (Tr. 178-83).  During his physical
therapy, plaintiff complained of low back pain, and reported short-
term relief following therapy.  (<u>Id.</u>)

The record indicates that plaintiff saw Scott Gibbs,
M.D., from September 26, 2001 to February 6, 2002.  (Tr. 204-226).
On September 26, 2001, plaintiff saw Dr. Gibbs in conjunction with

_____

[4]The Administrative Transcript includes records pre-dating plaintiff's
alleged date of onset.  Those records will be included in the following summary.

a workers' compensation case for a neurological independent medical evaluation ("IME"). (Tr. 204). Plaintiff gave a history of a low back injury on April 22, 1998, and a second injury on December 4, 1999, when he was attacked by an aggressive client. (Id.) Plaintiff complained of increased back pain and bilateral leg pain and radiation, and also neck pain. (Id.) He was taking Hyzaar,[5] OxyContin,[6] Elavil,[7] and vitamins. (Tr. 205). Dr. Gibbs fully examined plaintiff, and noted that a lumbar spine MRI performed on April 25, 2001 revealed a "very tiny" disc bulge at L4-5, and a "very slight" disc bulge at L5-S1. (Tr. 207, 209). Dr. Gibbs's impression was back and bilateral leg pain likely due to a sacroiliac joint dysfunction that did not require surgery. (Id.) Dr. Gibbs also noted a left bicep detachment related to plaintiff having lifted a sofa. (Id).

Plaintiff returned to Dr. Gibbs's office on November 20, 2001 and was seen by Christine M. Byrd, R.N., A.N.P., for re-evaluation. (Tr. 210). Plaintiff reported that his symptoms had worsened since his last visit. (Id.) Plaintiff was tender over the lower lumbar spine and left sacroiliac joint. (Id.) Nurse Byrd's impression was back and leg pain likely due to sacroiliac

---

[5]Hyzaar is a combination of Losartan and Hydrochlorothiazide, and is used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601071.html

[6]OxyContin, or Oxycodone, is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html

[7]Amitriptyline, also known as Elavil, is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

joint dysfunction that did not respond to physical therapy, injection therapy and medication treatment. (Tr. 211). She recommended a course of physical therapy with a different therapist, a TENS unit, and follow-up in one month. (Id.) Nurse Byrd opined that, if this approach was unsuccessful, it may be that plaintiff had reached maximum medical improvement. (Id.) Plaintiff returned on December 18, 2001 and saw Nurse Byrd, and reported significant improvement, and was advised to continue his present course of treatment. (Tr. 212-13). However, plaintiff returned on January 15, 2002 and saw Victoria G. Holman, R.N., C.S., F.N.P., and reported no improvement, and reported that he now had hip pain. (Tr. 214). Nurse Holman noted that Dr. Gibbs reviewed treatment options with plaintiff and opined that he should wean off OxyContin, and that plaintiff should be referred to a pain specialist to monitor plaintiff's use of OxyContin if necessary. (Tr. 215).

Plaintiff underwent a cervical and lumbar myelogram and post-myelogram CT on February 4, 2002 at Southeast Missouri Hospital. (Tr. 219-26). On February 6, 2002, plaintiff saw Dr. Gibbs, who noted that the myelogram and CT testing showed spondylosis at C4-5, C5-6 and C6-7, and small osteophytes and a slight disc bulge at C3-4. (Tr. 217). Dr. Gibbs noted that plaintiff had low back pain and right hip pain that seemed most likely due to right sacroiliac joint dysfunction, with no myelopathy or radiculopathy, and that there were no findings

-12-

warranting neurosurgical intervention. (Id.) Dr. Gibbs also noted
that plaintiff had neck discomfort that may be due to moderate
spondylosis at C4-5 and more so at C5-6 and C6-7. (Id.) Dr. Gibbs
noted that plaintiff's condition did not warrant surgical
intervention, but that if his condition worsened, his spondylosis
should be reevaluated. (Tr. 218). Regarding plaintiff's back, Dr.
Gibbs noted that it was most likely due to his sacroiliac joint,
and that plaintiff should continue with non-surgical measures and
possibly consider chiropractic therapy. (Id.)

From February 7, 2004 to November 14, 2005, plaintiff saw
Richard Musser, M.D., with complaints of back pain, dizziness, and
headaches, and also for complaints related to headache and cold-
type conditions, and sinus infection. (Tr. 231-38). On November
22, 2005, plaintiff complained of dizzy episodes and a cyst on his
left ear. (Tr. 239). On November 28, 2005, his dizziness had
improved, (Tr. 240), and on December 5, 2005, he complained of
dizziness and left ear pain. (Tr. 241). An MRI of plaintiff's
brain was performed on December 5, 2005, and revealed a retention
cyst in the right maxillary sinus; and a small area of abnormal
increased signal intensity in the right parietal lobe, which could
be nonactive MS, or ischemic changes from cerebrovascular disease.
(Tr. 244).

On December 13, 2005, plaintiff was seen by David Lee,
M.D., on referral from Dr. Musser, for evaluation of dizziness,
which plaintiff described as a sensation of being off balance, or

a spinning of his environment. (Tr. 252-55). Plaintiff denied associated hearing loss, ear pressure, vision problems, speech disorder, facial numbness/weakness, or paralysis. (Tr. 252). He indicated a history of migraine headaches over the past 25 to 30 years, and also stated that he had injured his back and neck at work several times, resulting in chronic neck pain, headaches, and back and leg pain. (Tr. 253). Plaintiff was taking MS Contin,[8] Clonazepam,[9] Diovan[10] and Norco.[11] (Id.) Physical examination revealed mild kyphosis and tenderness on palpation of the thoracic or lumbar spine. (Tr. 254). Neurological examination was largely normal but revealed a somewhat unsteady gait. (Id.) Dr. Lee found that plaintiff's clinical history and findings upon exam were suggestive of dizziness secondary to peripheral vestibular disease, and started plaintiff on a trial of Transderm Scop.[12] (Tr. 255).

On April 8, 2005, plaintiff saw Yuli Soeter, M.D., at

---

[8]MS Contin, or Morphine, is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html

[9]Klonopin, or Clonazepam, is used to control seizures. It is also used to control anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

[10]Diovan, or Valsartan, is used alone or in combination with other medications to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697015.html

[11]Norco is a form of hydrocodone, which is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html

[12]Transderm Scop, or Scopolamine, is used to prevent nausea and vomiting caused by motion sickness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682509.html

Advanced Healthcare Surgical Center. (Tr. 290).[13] Plaintiff complained of extreme and constant neck pain, which he rated as a ten on a scale of one to ten, secondary to having been hit in the back of the neck by an aggressive client. (Id.) Plaintiff was taking Morphine, Darvon,[14] Cymbalta,[15] and Klonopin. (Id.) Upon examination, Dr. Soeter noted significant tenderness and multiple trigger points identified in the left paracervical muscle. (Tr. 291). Dr. Soeter assessed cervical radiculopathy, muscle inflammation, and paracervical muscular discomfort. (Id.) She ordered a trigger point injection, and a cervical MRI. (Id.)

Plaintiff returned to Dr. Soeter on May 6, 2005 with complaints of neck pain radiating down his left arm. (Tr. 287). Upon examination, Dr. Soeter noted neck tenderness and muscle spasm, but full motor strength. (Id.) Her assessment was cervicalgia, cervical disc displacement, degenerative disc disease, and trigger point in the left trapezius muscle. (Id.) Trigger point injections were administered. (Tr. 288). Plaintiff returned on May 20, 2005 and reported significant pain relief with the cervical epidural injections. (Tr. 285). He complained of low

---

[13]Dr. Soeter noted that he had seen plaintiff three years prior for low back pain, and had administered two lumbar epidural injections. (Tr. 290).

[14]Darvon, or Propoxyphene, is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682325.html

[15]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder, and is also used to treat pain resulting from diabetic neuropathy and fibromyalgia. http://www.nlm.nih.gov/medlineplus/ druginfo/ meds/a604030.html

back pain.  (Id.)  Plaintiff had full bilateral lower extremity motor strength.  (Id.)  Lumbar epidural injection was ordered. (Id.)  Plaintiff returned to Dr. Soeter on June 3, 2005 and reported significant relief with lumbar epidural injection, but still had complaints of lumbar pain and occipital headache.  (Tr. 281).  Dr. Soeter's assessment was lumbago with radicular symptoms; occipital neuralgia; and cervicalgia with radiculopathy.  (Id.) Trigger point injections were planned.  (Tr. 282).  Plaintiff returned on June 17, 2005 and July 1, 2005, and reported good pain relief with no new pain, and denied medication side-effects.  (Tr. 279, 278).  Plaintiff returned on July 29, 2005 and reported significant lumbar pain, and requested epidural injection.  (Tr. 276).  On August 26, 2005, plaintiff reported good pain relief with epidural injection, but nevertheless had continued residual pain in the cervical and lumbar spine.  (Tr. 274).

       On September 23, 2005, plaintiff saw Dr. Soeter and reported suffering pain in his right buttock and right lower extremity after shopping at Wal-Mart.  (Tr. 271).  Plaintiff reported taking his medications as prescribed, which included Klonopin, Norco, and MS Contin, and denied side effects from his current medication regimen.  (Id.)  On September 30, 2005, October 21, 2005, and November 18, 2005, plaintiff reported great improvement with epidural injections, and that he had been compliant with his medication regimen, and had no side effects. (Tr. 268, 266, 265).

On December 16, 2005, plaintiff saw Dr. Soeter and reported significant pain in the neck region with radiation, and reported that he was to be evaluated by a neurologist for dizziness. (Tr. 263).

On January 12, 2006 and February 15, 2006, plaintiff saw Dr. Musser with continued complaints of dizziness, and for complaints of a sore throat and ear pain. (Tr. 294-95).

On February 10, 2006, plaintiff saw Dr. Soeter with complaints of continued neck pain, stating that the trigger point injections helped to some degree. (Tr. 316).

On March 3, 2006, plaintiff saw Dr. Soeter and reported significant neck pain. (Tr. 322). Dr. Soeter reviewed a cervical CT scan and noted that it showed degenerative arthritis at multiple levels. (Id.)

On March 21, 2006, Medical Consultant M. Guillams completed a Physical Residual Functional Capacity Assessment. (Tr. 299-306). It was opined that plaintiff could occasionally lift 20 pounds and frequently lift ten; could stand, walk and sit for a total of six hours in an eight-hour day; and could push and pull without limitation. (Tr. 300). It was noted plaintiff could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl, and could occasionally climb ladders/ropes/scaffolds and balance. (Tr. 301). Plaintiff was to avoid concentrated exposure to hazards. (Tr. 303). It was concluded that the medical evidence confirmed that plaintiff had degenerative changes in his cervical

spine, and dizziness.  (Tr. 304).  It was noted that the clinical findings were notable for some subjective dysfunction, but the overall findings did not support the existence of a significant functional compromise.  (Id.)  It was noted that plaintiff had good range of motion of the major joint and intact coordination and sensation.  (Id.)  Regarding plaintiff's memory problems, it was noted that review of plaintiff's medical records failed to identify the existence of a mental impairment, and that plaintiff had not complained of memory problems to any treating physicians, and no abnormal psychological findings were noted.  (Id.)  The Medical Consultant concluded that there was no mental impairment, and that further evaluation by a specialist was not warranted.  (Tr. 304).

        On April 6, 2006, plaintiff saw Joel Goebel, M.D., at Washington University School of Medicine, Department of Otolaryngology - Head and Neck Surgery, Dizziness and Balance Center.  (Tr. 311-15).  Plaintiff had been referred to Dr. Goebel by Dr. Lee.  (Tr. 298).  Plaintiff complained of dizziness, headaches, confusion, and memory loss, and gave the history of being hit in the back of the head.  (Tr. 311, 314).  He reported taking Hyzaar, Klonopin, MS Contin, and Norco.  (Tr. 311). Examination was unremarkable, but Dr. Goebel noted that plaintiff swayed when his eyes were closed.  (Tr. 314).  Dr. Goebel opined that plaintiff most likely had post traumatic disequilibrium, which may increase his underlying migraine complex and visual motion

sensitivity.  (Id.)  Dr. Goebel prescribed Nortriptyline,[16] stating
that if there was no improvement, a full vestibular function test
battery would be arranged.  (Id.)  Dr. Goebel's records also
include a January 24, 2006 patient questionnaire, in which
plaintiff noted complaints of dizziness and headache, confusion and
memory loss.  (Tr. 307).

On May 5, 2006, plaintiff saw Dr. Soeter with complaints
of low back pain and neck pain.  (Tr. 330).  Plaintiff reported
significant pain in the lumbar region and shoulders, even on his
current medication regimen.  (Id.)  On a questionnaire, plaintiff
was asked to indicate, on a one to ten scale (with ten being the
worst) how his pain interfered with different aspects of his life,
and he indicated a score of "6" pertaining to his ability to
maintain a normal work routine.  (Tr. 337).

On June 14, 2006, plaintiff saw Barry A. Singer, M.D.,
having been referred by Dr. Goebel, for evaluation of dizzy spells.
(Tr. 338-39).  Plaintiff reported constant dizziness since August
of 2005, stating that it occurred when he changed positions, and
also complained of experiencing a headache two to three times per
week.  (Tr. 338).  Upon examination, plaintiff's speech was fluent;
he could recall past presidents to Reagan (with the exception of
Bush, Sr.), and could spell "world" backwards.  (Id.)  Serial
sevens were intact to 93 only.  (Id.)  Plaintiff could recall three

---

[16]Nortriptyline is used to treat depression.  http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a682620.html

out of three objects immediately, and two out of three at five minutes without cues, and three out of three at five minutes with cues. (Id.) Motor examination was full throughout, with normal bulk and tone. (Tr. 339). Dr. Singer indicated that he had reviewed plaintiff's MRI. (Id.) Dr. Singer concluded that plaintiff's dizziness could be related to migraines. (Id.) In so noting, Dr. Singer noted that, while vertigo could result from head injury, plaintiff's ENT evaluation was unremarkable. (Id.) Dr. Singer appeared to speculate whether plaintiff's medications were causing dizziness, and started plaintiff on Topamax. (Tr. 339-40).

On September 7, 2006, plaintiff was seen by Raymond F. Cohen, D.O., for a medical rating evaluation related to a workers' compensation claim. (Tr. 341-48). Plaintiff gave a history of the onset and symptoms of his dizziness and neck and back pain consistent with his hearing testimony. (Id.) Dr. Cohen noted that he had reviewed all of plaintiff's medical records, including his MRI films and myelogram results. (Tr. 343).

Upon physical and neurological examination, Dr. Cohen noted that plaintiff was able to give a history of his condition, and that his mental status, including his short-term and remote memory, was intact. (Tr. 345). Motor examination revealed normal bulk, strength and tone in the upper and lower extremities. (Id.) Plaintiff's gait was "somewhat slow and unsteady," and plaintiff had some trouble getting on and off of the step stool to the examination table, stating that he felt dizzy and unbalanced. (Tr.

-20-

346).  Coordination and sensory examination were intact.  (Id.)

Examination of plaintiff's cervical spine revealed multiple tender areas throughout; reduced cervical range of motion and flexion; and complaints of pain.  (Id.)  Plaintiff's thoracic spine was unremarkable, but he was diffusely tender to palpation over the lumbosacral spine, and Dr. Cohen observed a loss of the normal lumbar lordotic curve.  (Id.)  Dr. Cohen identified multiple trigger points throughout the lumbosacral area, and range of motion testing elicited complaints of pain.  (Tr. 346).  Straight leg raise testing was negative at 90 degrees, and there were no radicular findings.  (Id.)

Dr. Cohen diagnosed plaintiff with bilateral sacroiliac joint dysfunction, aggravation of cervical and lumbar degenerative disc disease; cervical and lumbar myofascial pain disorder; and a closed head injury with post-traumatic vertigo and dizziness. (Id.)  Dr. Cohen concluded that plaintiff would continue to require injections to his cervical and lumbar spine.  (Id.)  Dr. Cohen stated that plaintiff was "permanently and totally disabled and not capable of gainful employment." (Tr. 348.)  Dr. Cohen went on to state that plaintiff should be permanently restricted from any prolonged sitting, standing, bending, lifting greater than five to seven pounds, twisting, stooping, kneeling, crawling, climbing, ladder work, or walking on uneven surfaces.  (Id.)  Dr. Cohen also opined that plaintiff should not do any activity requiring him to keep his head and neck in any type of sustained or awkward

position.  (Id.)

On November 1, 2006, plaintiff saw Dr. Goebel. (Tr. 349-51).  Dr. Goebel opined that plaintiff's "working diagnosis" was post-traumatic disequilibrium, which Dr. Goebel stated was based upon plaintiff's history, and which might have aggravated an underlying migraine complex and visual motion sensitivity.  (Tr. 349).  Dr. Goebel stated that he had started him on Nortriptyline, but plaintiff did not tolerate the medication well.  (Id.) Examination and objective testing were normal.  (Tr. 350).  Dr. Goebel wrote that plaintiff did "exhibit some evidence of postural instability on laboratory testing and on physical examination which [could] be a combination of factors including plaintiff's back problems and perhaps sense of disequilibrium coming after his head injury."  (Id.)  Dr. Goebel opined that plaintiff was capable of sedentary work that did not involve lifting or dangerous machinery, and also stated that plaintiff should not work above floor level or on any heights.  (Tr. 351).

On December 18, 2006, Wilbur T. Swearingin, C.R.C., a Rehabilitation Consultant, completed a Vocational Rehabilitation Evaluation of plaintiff in conjunction with plaintiff's workers' compensation case.  (Tr. 352-84).  Plaintiff complained of neck pain, headache, dizziness, and lower back pain, and stated that his neck pain was increased due to the car trip he had taken that day. (Tr. 353).  Plaintiff did few household chores.  (Tr. 354).  Mr. Swearingin observed plaintiff to sit with mild discomfort, and

-22-

noted that plaintiff periodically stood and moved around, and appeared to become more comfortable as the evaluation progressed. (Id.)

Mr. Swearingin conducted an exhaustive review of plaintiff's medical records. (Tr. 354-61). Mr. Swearingin opined that, considering plaintiff's medical restrictions, chronic pain, dizziness, advancing age and seventeen-year history of work in the mental health field, it was unlikely that an employer in the normal course of business would consider hiring him. (Tr. 369). Mr. Swearingin wrote: "Considering Mr. Heath's medical impairments, his work restrictions, advancing age and employment history, it is my opinion [plaintiff] is neither employable nor placeable in the open labor market. [Plaintiff] is permanently and totally disabled." (Tr. 369).

The record reflects that plaintiff saw Dr. Musser on 10 occasions from July 7, 2006 to April 20, 2007 with complaints related to back pain and dizziness, and perhaps depression. (Tr. 386-95). On November 27, 2006, plaintiff complained of pain that restricted his activity. (Tr. 390). There do not appear to be notations of abnormal findings upon exam, with the exception of back tenderness; however, Dr. Musser's notes are difficult, and at times impossible, to read. See (386-95). It appears that he

regularly prescribed medications for plaintiff, including Effexor,[17] Lorcet,[18] and Prozac, but again, due to the condition of the records, it is difficult to say so with certainty. See (Id.)

On August 28, 2006, Dr. Musser completed a Physician's Report, apparently in conjunction with plaintiff's workers' compensation claim. (Tr. 401-03). Dr. Musser noted plaintiff's diagnoses as chronic low back pain and depression, and appeared to opine that plaintiff was disabled and that it was "unknown" when plaintiff could return to work. (Tr. 401). He opined, however, that plaintiff could occasionally sit, stand and walk; could never balance; and could occasionally bend and walk on uneven surfaces. (Tr. 402). He also opined that plaintiff could occasionally lift, carry and push/pull up to 20 pounds, but never lift, carry or push/pull over 20 pounds. (Id.)

On June 26, 2006, plaintiff presented to Poplar Bluff Regional Medical Center for MRI studies of his brain and spine. (Tr. 404). MRI of plaintiff's spine revealed disc desiccation at all lumbar disc spaces, more so at L4-5 and L5-S1. (Tr. 405). At L3-4, mild diffuse disc bulge was noted, as was degenerative arthritis. (Id.) At L5-S1, diffuse disc protrusion and posterior

---

[17]Effexor, or Venlafaxine, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

[18]Lorcet is a combination of Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

osteophytes were noted, with no evidence of nerve root compression. (Id.)  The impression was degenerative arthritis, and no evidence of disc extrusion and spinal canal stenosis.  (Tr. 406).  MRI of plaintiff's cervical spine revealed disc desiccation at C3-4, C4-5, C5-6, and C6-7, and the impression was posterior disc spur complexes at C3-4, C4-5, and C5-6.  (Tr. 407).  MRI of plaintiff's brain revealed only mild right ethmoid sinusitis.  (Tr. 409).

On September 21, 2006, plaintiff underwent psychiatric evaluation with psychiatrist Ravdeep Khanuja, M.D., of the Family Counseling Center, having been referred by Dr. Musser.  (Tr. 410-17).  Plaintiff complained of dizziness, explaining his symptoms and giving the same history of injury he gave during his administrative hearing.  (Tr. 410).  Plaintiff also complained of memory problems.  (Id.)  Dr. Khanuja noted that plaintiff's complaints were inconsistent with vertigo.  (Id.)  Plaintiff reported that he was currently taking Effexor with some improvement in his symptoms of depression, and also reported taking Hyzaar, MS Contin, Lorcet, and Lipitor.[19]  (Tr. 410-11).  He denied medication side effects.  (Tr. 410).

Upon examination, plaintiff was noted to be in no distress, with a generally appropriate mood and affect but some

_____

[19]Lipitor, or Atorvastatin, is used along with diet, exercise, and weight-loss to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600045.html

depressive ideation. (Tr. 411). Dr. Khanuja concluded that, cognitively, plaintiff was grossly intact, and diagnosed plaintiff with adjustment disorder with depressed mood and cognitive disorder, and assigned a GAF of 55. (Tr. 411). Dr. Khanuja opined that plaintiff's symptoms were not severe enough to meet criteria for a major depressive episode. (Id.)

On October 13, 2006, plaintiff saw Dr. Khanuja and reported doing "fair," and that Effexor had been helpful. (Tr. 413). Plaintiff's examination was normal. (Id.) During another visit, Dr. Khanuja noted that plaintiff reported experiencing jerky movements when taking Effexor, and that his dosage was decreased, and plaintiff reported feeling better and sleeping better. (Tr. 414). Plaintiff reported poor memory and concentration. (Id.) Examination revealed a constricted affect. (Id.)

On January 5, 2007, Dr. Khanuja noted that plaintiff was "somewhat vague" in describing his symptoms, and that he described his mood as "bored and somewhat stressed." (Tr. 415). Plaintiff reported sleeping poorly, and Dr. Khanuja noted that plaintiff was "awaiting his benefits to start." (Id.) Dr. Khanuja noted that plaintiff did not meet the criteria for major depressive disorder. (Id.) On March 1, 2007, Dr. Khanuja noted that plaintiff reported stopping his psychotropic medication and that he felt better; denied any prolonged depressed mood; and explained that he was focusing on his physical issues of pain and difficulty remembering things. (Tr. 416). Dr. Khanuja noted that plaintiff was

relatively stable. (Id.) Finally, on March 1, 2007, plaintiff reported to Dr. Khanuja that he was doing "fair," and denied any depressed mood and had taken himself off of Prozac because he did not need it. (Tr. 417). Dr. Khanuja wrote that plaintiff was stable without an antidepressant, and that there was "no criteria" for antidepressant medication. (Id.)

On September 27, 2007, plaintiff underwent a psychological consultative examination with Jonathan D. Rosenboom, Psy.D., a clinical psychologist. (Tr. 418-26). Dr. Rosenboom noted that plaintiff took Valium for dizziness. (Tr. 418). Plaintiff complained of dizziness and a poor memory, stating that he could not recall new numbers. (Tr. 419). Plaintiff also reported that he felt "agitated" when he could not do things he used to do, and that he did not sleep well due to pain. (Id.) Plaintiff reported that he still played the guitar and harmonica, and that he showered and dressed daily, cleaned his dentures twice per day, and watched the news and religious programming on television. (Tr. 420).

Dr. Rosenboom administered I.Q. testing, as well as testing that was designed to assess plaintiff's memory and to determine whether plaintiff was malingering. (Tr. 422-23). He concluded that plaintiff's I.Q. testing revealed results consistent with plaintiff's verbal abilities and his reported educational achievement. (Tr. 422). Dr. Rosenboom also concluded that plaintiff had no memory impairment, and that testing designed to

test for malingering was negative. (Tr. 423).

Dr. Rosenboom also administered the MMPI-2,[20] noting that plaintiff approached the test in an honest, non-defensive manner. (Tr. 424). Dr. Rosenboom wrote that plaintiff's MMPI profile was "most similar the [sic] 1-2-3/2-1-3/2-3-1 profile type." (Tr. 424). Dr. Rosenboom wrote that "individuals who have achieved this MMPI profile type in the past have been diagnosed as suffering from a Somatoform Disorder, Anxiety Disorder, or Depressive Disorder," and that "individuals with this code type complain of physical symptoms and there often seems to be a secondary gain associated these [sic] complaints." (Id.) Dr. Rosenboom concluded that plaintiff's diagnosis was Undifferentiated Somatoform Disorder,[21] with social stressors including limited finances and unemployment. (Tr. 424-25). He assessed a GAF of 55. (Tr. 425).

The record indicates that plaintiff saw Dr. Musser on five occasions from April 20, 2007 through September 14, 2007, and was prescribed medication. (Tr. 427-31). Plaintiff complained of dizziness and pain, but Dr. Musser did not note any objective findings. (Id.)

---

[20]"MMPI" stands for Minnesota Multiphasic Personality Inventory.

[21]"Somatoform" disorder is a mental disorder that causes the sufferer to believe that his physical symptoms are more serious than clinical data would suggest. The pain in this condition is thought to be related to psychological factors such as stress. People with this illness may have other medical problems, but these do not fully explain the pain. See http://www.nlm.nih.gov/medlineplus/ ency/article/000922.htm; see also Roe v. Chater, 92 F.3d 672, 676 n. 5 (8th Cir. 1996) ("Somatoform disorder is a condition characterized by physical symptoms that suggest a general medical condition and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder.")

## III.    The ALJ's Decision

The ALJ in this case found that plaintiff had the severe impairments of post traumatic disequilibrium, and degenerative disc disease of the lumbar spine, but that neither of plaintiff's impairments were of listing-level severity. (Tr. 11). Having cited the appropriate Regulations, (Tr. 12), the ALJ wrote that he had considered plaintiff's complaints of symptoms precluding all work, and had found them not fully credible. (Tr. 15-17). The ALJ found that plaintiff could not perform his past relevant work, but that he retained the residual functional capacity ("RFC") to perform sedentary work, inasmuch as plaintiff could lift and/or carry up to ten pounds occasionally and up to five pounds frequently; stand and/or walk for up to two hours in an eight-hour day; and sit for six hours out of an eight-hour day. (Tr. 11, 17.) The ALJ further concluded that, due to plaintiff's non-exertional limitations, he was unable to climb ladders, ropes and scaffolds; could not perform work requiring him to balance his body; and must avoid hazardous work settings. (Tr. 11-12). The ALJ noted that plaintiff was 52 years of age at the time of the hearing, defined as "closely approaching advanced age," and that transferability of job skills was therefore immaterial. (Tr. 18). The ALJ wrote that, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (Id.) The ALJ concluded that plaintiff was not under a disability, as it is defined by the

-29-

Social Security Act ("Act"), at any time through the date of the decision.  (Tr. 19).

## IV.    Discussion

        To be eligible for disability benefits under the Social Security Act, a plaintiff must prove that he is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001);  <u>Baker v. Secretary of Health & Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  <u>See</u> 42 U.S.C. §§ 423(d)(1)(A), 1382c.  The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  <u>Id.</u>  It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Heckler v. Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young

o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ;

2.   The plaintiff's vocational factors;

3.   The medical evidence from treating and consulting physicians;

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.   Any corroboration by third parties of the plaintiff's impairments;

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608.

However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff challenges the weight the ALJ gave the medical evidence of record. Specifically, plaintiff alleges that the ALJ ignored the opinion of every examining physician who offered an opinion regarding plaintiff's RFC, with the exception of Dr. Rosenboom. Plaintiff also alleges that the ALJ improperly rejected the opinion of Drs. Musser and Cohen, and erred in the weight he assigned to Mr. Swearingin, Dr. Goebel, and Dr. Rosenboom.

Plaintiff also challenges the hypothetical question the ALJ posed to the VE, and argues that the ALJ failed to properly consider his transferable skills, inasmuch as he had attained age 55. Finally, plaintiff challenges the ALJ's failure to discuss plaintiff's medication side effects. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole. For the following reasons, the Commissioner's arguments are well-taken.

A.    Medical Opinion Evidence

Plaintiff first contends that the ALJ ignored the opinion of every physician, with the exception of Dr. Rosenboom, in

-33-

reaching his decision that plaintiff retained the RFC to perform sedentary work. Review of the record reveals no error.

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

An ALJ has a duty to evaluate the medical evidence as a

-34-

whole.  Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007) (citing Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).  While a treating physician's opinion is entitled to special deference under the Social Security Regulations, it does not automatically control, because the ALJ must evaluate the record as a whole.  Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006).  In order for a treating physician's opinion to be entitled to controlling weight, it must be supported by medically acceptable clinical and laboratory diagnostic techniques, and not be inconsistent with other substantial evidence in case record.  Id.  The Eighth Circuit has upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, see Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996).  Whether the ALJ grants a treating physician's opinion substantial or little weight, the Regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. §§ 404.1527(d)(2) 416.927(d)(2); Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000).  The final RFC determination is for the Commissioner to make.  Ellis v. Barnhart, 392 F.3d 988, 994-95 (8th Cir. 2005).

Plaintiff suggests that the ALJ failed to give proper

weight to Dr. Musser's opinion. As noted above, on August 28, 2006, Dr. Musser completed a Physician's Report, wherein he wrote that plaintiff was "disabled" and could not return to work, and that it was "unknown" when plaintiff could return to work. (Tr. 401). However, Dr. Musser went on to note that plaintiff could occasionally sit, stand, walk, bend, walk on uneven surfaces, reach at shoulder level, drive, and lift up to 20 pounds, but should never balance, kneel, crawl, climb, or reach above shoulder level. (Tr. 401-02).

Contrary to plaintiff's argument, the ALJ did not ignore Dr. Musser's opinion. In his decision, the ALJ specifically noted Dr. Musser's opinion and detailed his findings. Furthermore, while the ALJ ultimately determined that plaintiff could sit longer than would be suggested by Dr. Musser's opinion, the remainder of the ALJ's determination is consistent with Dr. Musser's opinion. In fact, the lifting restrictions the ALJ imposed were more restrictive than Dr. Musser's, and the ALJ's determinations regarding plaintiff's ability to balance and to stand and walk were consistent with Dr. Musser's opinion.

Plaintiff also suggests that plaintiff ignored the findings of Drs. Lee, Soeter, and Singer. It certainly cannot be said that the ALJ ignored the findings of these doctors, inasmuch as the ALJ's decision specifically notes their treatment records and discussed their findings. Furthermore, as the above summary of the medical records indicates, none of these physicians offered any

-36-

opinions regarding plaintiff's ability to function, and plaintiff offers no explanation of how their opinions would have changed the ALJ's RFC determination.

Plaintiff also suggests that the ALJ ignored Dr. Goebel's opinion. This is not supported by the record. The ALJ fully discussed Dr. Goebel's medical records, and noted Dr. Goebel's findings regarding plaintiff's abilities. As noted above, on November 1, 2006, Dr. Goebel opined that plaintiff was capable of sedentary work that did not involve lifting or dangerous machinery, and also stated that plaintiff should not work above floor level or on any heights. While the ALJ did conclude that plaintiff was capable of lifting up to ten pounds occasionally and up to five pounds frequently, it cannot be said that the inclusion of such mild lifting requirements is truly inconsistent with Dr. Goebel's vague statement that plaintiff's job should "not involve lifting," inasmuch as Dr. Goebel did not specify a weight limit. (Tr. 351). Furthermore, if it could be said that Dr. Goebel truly opined that plaintiff was unable to lift any amount of weight, the ALJ would have been entitled to disregard that opinion because it is inconsistent with other medical evidence in the record, including the opinion of plaintiff's treating physician, Dr. Musser, who opined that plaintiff was capable of lifting 20 pounds. <u>Bentley v. Shalala</u>, 52 F.3d 784, 787 (8th Cir. 1995) (ALJ is free to reject the conclusions of any medical expert if they are inconsistent with the medical record as a whole).

Plaintiff also suggests that the ALJ ignored Dr. Cohen's opinion. As noted above, on September 7, 2006, plaintiff saw Dr. Cohen for a medical rating examination in conjunction with his workers' compensation case, at which time Dr. Cohen opined that plaintiff was permanently and totally disabled and incapable of gainful employment. However, as the ALJ noted, Dr. Cohen went on to note certain functional restrictions. The ALJ noted Dr. Cohen's opinion and discussed his findings, and concluded that he was giving it little weight because Dr. Cohen had evaluated plaintiff on only one occasion, and because Dr. Cohen's findings were inconsistent with other medical evidence in the record. Indeed, Dr. Musser, plaintiff's treating physician, did not limit plaintiff's activities as strictly as did Dr. Cohen. The ALJ properly discredited Dr. Cohen's opinion. "As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); see also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.")

Plaintiff also suggests that the ALJ failed to give proper weight to Mr. Swearingin's opinion. As discussed above, Mr. Swearingin, a Rehabilitation Consultant, evaluated plaintiff on

December 18, 2006, and concluded that plaintiff was totally disabled. In his decision, the ALJ noted Mr. Swearingin's report and his conclusion that plaintiff was not employable or placeable in the open labor market. The ALJ wrote that, for reasons similar to those he gave for giving Dr. Cohen's opinion little weight, he was assigning little weight to Mr. Swearingin's opinion. Substantial evidence supports the ALJ's decision.

As the Commissioner correctly notes, Mr. Swearingin met with plaintiff on only one occasion. As noted above, the opinion of a consulting source who examines a claimant on only one occasion does not constitute substantial evidence. Wagner, 499 F.3d at 849; Kelley 133 F.3d at 589. In addition, Mr. Swearingin was a Rehabilitation Consultant, and was therefore not an "acceptable medical source" as such is defined in the Regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a). Also troubling about Mr. Swearingin's opinion is that he appeared to base his opinion that plaintiff was disabled on his conclusion that plaintiff was not employable or placeable in the open labor market. As noted above, the Act specifies that, to be considered disabled, a person must be unable to engage in his past work and in any other kind of substantial gainful work, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. Bowen, 482 U.S. at 140 (1987); Heckler, 461 U.S. at 459-46.

Finally, the undersigned notes that Drs. Musser and Cohen

-39-

(and Mr. Swearingin) opined that plaintiff was "disabled" or unable
to return to work.   To the extent plaintiff's arguments can be
interpreted as challenging the ALJ's failure to give substantial
weight to these opinions of disability, the undersigned notes that
physician opinions that a claimant is "disabled" or unable to work,
even when offered by a treating physician, are not the types of
medical opinions that are entitled to deference, because they
involve issues specifically reserved for the Commissioner.   20
C.F.R. §§ 404.1527(e), 416.927(e); <u>Robson v. Astrue</u>, 526 F.3d 389,
393 (8th Cir. 2008) (citing <u>House v. Astrue</u>, 500 F.3d 741, 744 (8th
Cir. 2007)); <u>see</u> <u>also</u> <u>Ellis</u>, 392 F.3d at 994 ("A medical source
opinion that an applicant is "disabled" or "unable to work,"
however, involves an issue reserved for the Commissioner and
therefore is not the type of "medical opinion" to which the
Commissioner gives controlling weight"); <u>Stormo v. Barnhart</u>, 377
F.3d 801, 806 (8th Cir. 2004) ("Treating physicians' opinions are
not medical opinions that should be credited when they simply state
that a claimant can not be gainfully employed, because they are
merely opinions on the application of the statute, a task assigned
solely to the discretion of the Commissioner.")  Further, although
medical source opinions are considered in assessing RFC, the final
determination of RFC is left to the Commissioner. See 20 C.F.R. §§
404.1527(e)(2); 416.927(e)(2).   Moreover, while Drs. Musser and
Cohen wrote that plaintiff was "disabled," they still offered
opinions regarding restrictions that would allow plaintiff to

function in a satisfactory manner - opinions inconsistent with a conclusion that plaintiff was totally disabled from all work.  <u>See</u> <u>Cruze</u>, 85 F.3d at 1325 (where physician makes inconsistent findings relating to claimant's condition, the ALJ is entitled to give little weight to such findings).  Finally, the undersigned notes that, during the administrative hearing, plaintiff testified that he would be able to stay at a work site eight hours a day, five days per week, if his job was as simple as coming to the hearing and talking, as he was doing that day.  (Tr. 43).

Plaintiff also alleges that the ALJ improperly weighed Dr. Rosenboom's opinion, inasmuch as it does not support a finding that plaintiff can perform the exertional demands of light work. (Docket No. 12 at 14-15).  The ALJ in this case, however, found that plaintiff was capable of sedentary, not light, work. Plaintiff also suggests that the ALJ's finding that plaintiff could sit for six hours was "inconsistent with what Dr. Rosenboom stated."  In his report, Dr. Rosenboom noted that he observed plaintiff to sit for five hours, with occasional breaks to stand and stretch.  It cannot be said that this is necessarily inconsistent with the ALJ's finding that plaintiff could sit for six hours.  Dr. Rosenboom did not state that plaintiff was unable to sit longer than five hours; rather, he stated that he observed him to sit for five.

Therefore, for the foregoing reasons, the undersigned concludes that the ALJ in this case properly considered all of the

medical evidence of record, and assigned the proper weight to all
of the medical opinions in formulating plaintiff's RFC.


   B.   Credibility Determination

      While plaintiff herein does not specifically challenge
the ALJ's credibility determination, he does challenge the weight
the ALJ gave to certain medical evidence of record, and he also
alleges error in the hypothetical questions the ALJ posed to the
VE.   The undersigned has therefore fully analyzed the ALJ's
credibility determination, and now concludes that it is supported
by substantial evidence on the record as a whole.

      In   assessing   plaintiff's   credibility,   the   ALJ
acknowledged his duty to consider all of the evidence of record
relevant to plaintiff's complaints, and cited the Regulations
corresponding with the Eighth Circuit's decision in Polaski v.
Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984).   The ALJ then set
forth numerous inconsistencies in the record detracting from
plaintiff's credibility.

      The ALJ noted that objective medical evidence simply
failed to support a finding that plaintiff was as limited as he
alleged.   The ALJ noted that MRI evaluation of plaintiff's lumbar
and cervical spine revealed disc dessication and osteophytes, but
no evidence of herniation or nerve root compression.   The ALJ also
noted that Drs. Singer and Soeter found plaintiff to have full
strength in his extremities upon examination.   The ALJ also noted

that Dr. Khanuja opined that plaintiff's symptoms were not severe enough to be categorized as depression, and that plaintiff reported that he had taken himself off of his antidepressant medication because he felt he did not need it. The ALJ also noted that Dr. Rosenboom's testing revealed that plaintiff's memory, and his ability to respond appropriately to work supervisors, co-workers and work stressors, was unimpaired. The ALJ also noted that, while plaintiff's complaints of dizziness were partially credible, the medical evidence demonstrated that plaintiff's symptoms were not the result of true vertigo, and that Dr. Goebel opined only that plaintiff should avoid work involving heights and heavy machinery, but could otherwise perform sedentary work. The ALJ also noted that Dr. Rosenboom's testing revealed that plaintiff had a tendency to exaggerate symptoms in an effort to enhance claims for benefits.

While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir. 1997); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered).

The ALJ also noted that, while plaintiff had a strong work record, the other factors he had discussed outweighed it. The ALJ also considered plaintiff's daily activities, noting that, in

-43-

a daily activities report, he described a typical day as helping his daughter get ready to meet the school bus, taking his father to the store or to doctor's appointments, and helping with simple chores around the house. The ALJ also noted that plaintiff testified that he performed simple household cleaning such as cleaning the kitchen and bathroom; and that he reported shopping for groceries, cooking for his nine-year-old daughter, and doing laundry. The ALJ also noted that plaintiff told Dr. Rosenboom that he played the guitar and the harmonica. While such daily activities alone may not be sufficient to discredit plaintiff's allegations, the ALJ was entitled to consider them in evaluating plaintiff's allegations of totally disabling symptoms. <u>See</u> <u>Wagner</u>, 499 F.3d at 852 (while a claimant need not be bedridden to qualify for benefits, activities such as fixing meals, doing housework, shopping for groceries and visiting others were properly considered in discrediting subjective complaints); <u>see</u> <u>also</u> <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996) (although daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints).

In addition, the undersigned notes that, during the administrative hearing, the ALJ asked plaintiff whether he could stay at a work site for eight hours per day if his job were as simple as coming to the hearing and talking, as he was presently doing, and plaintiff testified that he probably could. This testimony is inconsistent with allegations of disabling impairments

precluding all work. Finally, the ALJ noted that Dr. Rosenboom, in interpreting the results of plaintiff's MMPI, noted that plaintiff's profile was consistent with individuals who complain of symptoms when there is often a secondary gain associated with them. The ALJ was entitled to consider evidence that plaintiff may have exaggerated his symptoms. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

Plaintiff contends that the ALJ erred because he did not discuss medication side effects. In support, plaintiff argues that he suffers from several medication side effects, including fatigue, stomach upset, and exacerbation of his symptoms of dizziness. Plaintiff also contends that he regularly takes Prednisone, which is a powerful steroid. Review of the ALJ's decision reveals no error.

It is well-established in the Eighth Circuit that, when assessing a claimant's credibility, the ALJ must consider, inter alia, the dosage, effectiveness, and side effects of medication. Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (citing Polaski, 739 F.2d at 1322). In his decision, the ALJ did not specifically address medication side effects, but he did cite the Regulations corresponding with Polaski, and he wrote that he had considered plaintiff's allegations in accordance with those requirements. The undersigned concludes that there was no error, inasmuch as the ALJ did state that he had considered plaintiff's allegations in accordance with the appropriate Regulations. An ALJ

does not need to discuss each and every <u>Polaski</u> factor in depth, as long as he points to the relevant factors, and gives good reasons for discrediting a claimant's complaints. <u>See</u> <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1038 (8th Cir. 2001).

Furthermore, the record does not support the conclusion that plaintiff suffered from medication side effects, and in fact, contains contrary information. During plaintiff's course of treatment with Dr. Soeter in 2005, he repeatedly stated that he had been compliant with his medication regimen of Klonopin, Norco, and MS Contin, and repeatedly denied side effects. (Tr. 268-71). In addition, when plaintiff saw Dr. Khanuja in 2006, he reported that he was taking Effexor, Hyzaar, MS Contin, Lorcet, and Lipitor, and denied side effects. (Tr. 410). Finally, in his Disability Report, plaintiff listed his current medications as Diovan, Klonopin, Lipitor, MS Contin, and Norco, and wrote that he had no side effects. (Tr. 139).

The undersigned has carefully reviewed the record, and believes that the ALJ's credibility determination was consistent with Eighth Circuit precedent; was adequately explained; and was supported by substantial evidence on the record as a whole. Where adequately explained and supported, credibility findings are for the ALJ to make. <u>See</u> <u>Tang v. Apfel</u>, 205 F.3d 1084, 1087 (8th Cir. 2000).

Furthermore, while plaintiff's challenge to the ALJ's RFC determination was limited to the weight the ALJ assigned to the

medical opinions, the undersigned has reviewed the ALJ's RFC determination in its entirety, and concludes that the ALJ properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole, and based his decision on all of the relevant, credible evidence of record. The undersigned concludes that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

C.    Vocational Expert Testimony

Plaintiff also challenges the hypothetical question posed to the vocational expert, stating that plaintiff "lacks the residual functional capacity to perform light work," and that the ALJ failed to discuss the mental demands of the work the VE suggested. (Docket No. 12 at 16). Plaintiff also suggests that the ALJ failed to properly consider his transferable skills, inasmuch as he was presently 55 years old, and therefore was a person of advanced age. Review of the decision reveals no error.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch, 201 F.3d at 1015). An ALJ may omit alleged impairments from a hypothetical question when there is no medical evidence that such impairments impose any restrictions on the claimant's functional capabilities. Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994).

As explained, supra, substantial evidence supports the ALJ's RFC and credibility determinations, and the ALJ properly considered and weighed all of the medical evidence and the opinion evidence of record.  As noted above, the ALJ noted that Drs. Rosenboom and Khanuja failed to support the conclusion that plaintiff had any severe memory or mental impairments.  Likewise, the ALJ's hypothetical questions included all the impairments he found to be credible.  See Strongson v. Barnhart, 361 F.3d 1066, 1072-73 (8th Cir. 2004)(VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination).  It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated."  Hunt, 250 F.3d at 625 (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)).  In addition, because it was not error for the ALJ to give less weight to the opinion evidence, as discussed above, the ALJ was not required to present those assessments to the vocational expert.  See Rogers, 118 F.3d at 602 (finding the ALJ appropriately weighed the treating physician's opinion and the hypothetical question adequately represented the limitations of the claimant).

Plaintiff suggests that, because he has now attained the age of 55, the ALJ should have determined his transferable skills in accordance with 20 C.F.R. § 404.1568(d)(4), which sets forth specific requirements for determining the transferability of skills in individuals 55 and over.  As the ALJ's decision notes, however,

-48-

at the time of the hearing, plaintiff was 52, and therefore did not meet the requirements of 20 C.F.R. § 404.1568(d)(4). In his decision, the ALJ correctly noted plaintiff's age, and correctly concluded that transferability of skills was not at issue.

Therefore, for all of the foregoing reasons,

On the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001); Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

*Frederick R. Buckles*
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of March, 2010.